Case number 20-1633 United States of America v. Michael White Jr. Oral argument not to exceed 15 minutes per side. Ms. McManus for the appellant. May it please the court. My name is Jennifer McManus and I represent the United States. With the court's permission, I'd like to reserve three minutes for rebuttal. The district court erred in suppressing the evidence in this case. We respectfully ask this court to reverse its decision. We believe the court erred both in finding that the search warrant was not supported by probable cause and in declining to apply the Leanne Goodfaith exception to the exclusionary rule. But this case can and should be resolved on the basis of probable cause alone. This court is well familiar with the probable cause standard. It requires a showing that there's a fair probability of evidence that evidence of a crime will be found in the premises to be searched. It is not a high bar and a reviewing court must give great deference to the decision of a magistrate or, as in this case, a judge that probable cause existed. Counsel, I appreciate the fair inference points and you have lots of good arguments. A lot of the cases in this area arise in the context of controlled buys. And, you know, what's nice about those cases in terms of strengthening the inference is that you have a situation where the officer, you know, pats someone down, right? Like they have, they know there's no cocaine on them, for example. They take the money, they go into the house, they come back and they have cocaine. So that inference is stronger. What do we do about that? Well, Your Honor, I would argue that the inference is stronger in this situation. So typically the confidential informant in a controlled drug transaction, as you've indicated, is searched to make sure that he or she doesn't have drugs on him or her. But here we have an undercover officer who is the buyer. So we, I think, reasonably can presume that the buyer in our situation, the detective, the affiant, does not already have drugs on him. In a controlled drug transaction, the dealer is not searched. It's the buyer, typically, the controlled, the confidential informant. So here you have a situation where you have a middleman dealer who, it's true, is not searched ahead of time because he's not a cooperating person. But he, and he goes and stops at a location before consummating the sale twice. So in that situation, as- But I mean, maybe this is much for your colleague on the other side. That's a good answer. I get the answer. But we still don't know whether the buyer might have already had cocaine. I mean, it's hard to understand why, hard to understand the conduct, but it's still quite possible it's not from White's house. That's correct. We don't, do not know for sure that the middleman dealer, in this case, Gerald Conkle, did not already have cocaine on him. That's, of course, possible. But as the Eighth Circuit reasoned in the Duke's case in rejecting that exact argument, it is nonetheless reasonable to infer that the dealer obtained the drugs from inside the house. Because if he already had the drugs on him, why would he make his customer wait while he goes somewhere else and then comes out with the drugs? And maybe it's possible to- He's trying to raise the price. He's trying to raise the price. He's showing how complicated this is. And we have to go to the alley and then we go here. For you, I'm going to have to charge a little more. He's trying to, the middleman is trying to make money. I don't know. Well, it's possible to come up with explanations that are innocent. But that is not, of course, what we're supposed to do, reviewing courts are supposed to do when they're reviewing whether an affidavit establishes probable cause. If a search warrant has issued, then the reviewing court is to give great deference to the decision of the issuing official. And we are supposed to review the affidavit in a common sense, reasonable manner, not with a grudging or negative attitude toward the information they're in. And so while it's possible to come up with some kind of explanation for why this would happen, it's certainly not very likely. What about the second? Excuse me. Sorry. What about the second buy? The first one is pretty good because the confidential informant is watching Conco the whole time. He goes to his house, he goes out. It's not quite as clear. I realized there's another officer, but it wasn't obvious to me that they never lost sight of him. He was in their sight the whole time or is or is that am I being unfair? Is it is the only reading of the record that between the confidential informant and the other officer, we never lost sight of the middle man. I believe that is the only reasonable reading of the affidavit. The affidavit says that Detective Schmidt had eyes on Conco at the moment where Conco left him down the alleyway and proceeded northbound to the Leahy residence. Meanwhile, Detective Liske observed Conco leave the affidavit, Detective Schmidt. So Liske, the other officer is watching while the dealer leaves the presence of the affidavit, Detective Schmidt, and sees him exit, leave the affidavit and travel northbound. So he's watching as Conco travels northbound toward the Leahy residence. And at that time, he observed Conco exit his vehicle and enter the rear of the Leahy Street residence. A short time later, Detective Liske then observed Conco exit the house and re-enter his vehicle. Detective Liske observed Conco traveling southbound in the alley in the direction of Afyon. So I suppose maybe as I read that there's a small inference to be made that there's not a moment where they lost sight of Conco. But it's a very small inference and really probably the only he's returning and turning over, coming from that direction, turning over the drugs. So perhaps there's an inference to be made, but it is very minor and reasonable one. Well, let's say you're right about all this. I was, you know, Judge Yonkers, of course, a terrific judge, and he seemed pretty upset about what happened here. And I I wondered if it wasn't the no-knock entry point that the warrant that he thought, I'm not sure it's your, I don't know who was in charge of this, but whoever's in charge of seeking these warrants, that he was upset someone was seeking the no-knock warrant given. I mean, this almost led to a killing. I mean, this was a very serious encounter, right? The white drew his weapon, and it's precisely the kind of thing that can lead to these, the violence we've seen so much of the last couple of years. Am I right in wondering if that's what's going on, and is the relevant office paying attention to what Judge Yonker was saying about being too casual when it comes to no-knock warrants? So this was a state warrant, and I'm certain that the concerns that Judge Yonker raised will be brought back, have been brought back to the people who execute the law enforcement officers who applied for and executed this warrant. And clearly, Judge Yonker had a significant concern about the no-knock entry. However, that is not a basis, of course, for suppressing the evidence in the case. And I actually also would disagree with Judge Yonker to the extent that he found that the justification in the affidavit was so out of bounds as to not even colorably constitute reasonable suspicion, which is a lower standard than probable cause, of course, under Richards. Reasonable suspicion to believe that an entry without knocking and announcing would potentially either result in danger or result in the destruction of the evidence. I thought the requirement was that you had to do more than say drugs were there. In other words, we all get the point that drugs can disappear quickly, but I didn't think you were allowed to get away with just saying they had cocaine, voila, they could be easily disposed of. I thought you had to do more, like they kept the cocaine in the bathroom or something like that. So it is absolutely the case that the execution of drug warrants are not a category that are reasonable suspicion that knocking and announcing their presence under the particular circumstances would be dangerous or futile or would inhibit the investigation of the crime. And in Richards, the court said, we're not going to say that drug warrants are exempt from that case-by-case analysis because there might be circumstances in which, even though the court said it is indisputable that felony drug investigations may frequently involve both of these circumstances, there may be situations in which they don't. Maybe the officers who are executing the warrant know who's inside. There's a mom and her kids. There's a lot of situations in which it wouldn't necessarily be the case. And the court said, by the way, there's also other categories of warrants that would seem to us to be at least equally dangerous, like investigating an armed robbery. So it's absolutely the case that it's not enough to say we're looking for drugs, but it is a relevant fact that it is a drug investigation, as the court said in Richards. In addition, the fact that the drugs are being sold in quantities that are easily disposed of, as opposed to in this court's decisions in Bates, which predates Richards, but in Bates and in Smith, those involved very large quantities of drugs that would not be kilograms of cocaine. Another involved a large quantity of drugs secreted in a vehicle in the garage. So the court said in those cases, well, this is not one of those cases like in Jones, where the drug transactions are taking place near the back door in order to quickly dispose of the drugs. So here we have, I think, at least something close to Jones, because we have drugs being sold in a residence in relatively smaller quantities, three gram quantities that could be easily disposed of. We have a situation where the officers do not know who is present inside the house. That's a relevant circumstance to consider, according to Richards. And we have the fact that there's surveillance cameras and exterior lighting that indicate that watching. Exterior lighting that goes on automatically, I get nervous about that kind of reasoning. I mean, you know, people don't go to wealthy neighborhoods and see exterior lighting and say, aha, I suspect there's insider trading going on there or drug trading. I mean, it just doesn't seem quite right to me. That's true. That wouldn't be relevant enough alone. But here you have the fact that there have been two undercover drug transactions that have occurred at this residence. It's the totality of the circumstances that have to be considered. But in all events, of course, our position is that Hudson is dispositive of this question, and that while there is a good and healthy dialogue going on across the country about the wisdom of no-knock warrants, in all events, suppression is not an appropriate remedy. Right. You'll have your rebuttal. Ms. Tosic, is that correct? Yes, Your Honor. Thank you. My name is Yasna Tosic. I represent Defendant Appellee Mr. Michael Akeem White. And our position is that District Court Chief Judge Yonker properly granted motion to suppress finding that there is no probable cause and finding that officers could not, in good faith, rely on this warrant. What we have here is that there is a crime that is committed by someone other than the defendant, a third party. And that crime occurred at the location other than the residence search. And the only connection... Ms. Tosic, there's a lot of controlled by cases where two controlled by's, and in fact, some involve just one, but there are quite a few of these cases. And all they're asked is whether it's a actually arguably a better case, because the person that ends up with the drugs is working for the government. So pretty fair to assume they didn't already have the drug. It really does seem quite strange to have the confidential informant ask CONCO two different times to buy drugs, go to the same, you know, he doesn't sell them at that point. It just seems very, it's really hard to think of other explanations. I mean, I suppose the second sale was the end of the drugs in the White House. That's possible. It is possible CONCO had the drugs all along, but that's quite puzzling behavior. I can't even think of the explanation because he thinks he doesn't think the confidential informant's an officer. He thinks he's a drug buyer. So it's just very hard for me to figure out what else at a minimum, it just seems like a legitimate inference. That's what I'm struggling with on your side of the case. Well, there is, there is no dispute that Jared CONCO had drugs on him because he delivered his drugs and he was observed by confidential, by undercover officer hand him these drugs. But it is a different issue whether he obtained these drugs in Mr. White's house. You think he got the drugs on the way to the house, on the way back to the house? Is that when he, when he got out of the car, is that the idea? He could, he could have have drugs on him before he went into the house. And the reason when he, go ahead, go ahead, that he went into the house can be, as your Honor said, that he maybe wanted to have him wait to kind of raise the price of the drugs. Maybe he did not trust this confidential undercover officer and wanted him to follow him and to drive around and drive to somebody's house to make sure he's not being followed and go into the house to kind of observe who is around. And there could be any other explanation why someone would go into someone's house. The thing remains in this case that no one actually saw what happened in the house. And CONCO did not himself say that Mr. White is his supplier like we had in some other cases. So there is nothing, there is no, any allegation that Mr. White was ever involved in any criminal activity, that his house was ever involved in any criminal activity, that drugs were ever seen in his house. And the only thing that was, that officer kind of follow up on this is to find out that Mr. White is a black man of certain height and weight and owns a car. So that is in Judge Yonker opinion. Wait, wait, just to make sure I'm following this point, are you saying it wasn't clear that this house was Mr. White's house? Is that what you're saying? No, it was Mr. White's house. They confirmed that. But there is no allegation that Mr. White or his house were ever involved in any drug activity or any even suspicious activity. So we have a person go into someone else's house where we don't know what happened. We know pretty much nothing, at least nothing incriminating about this. But it's still so mysterious why he did this. We've got the raising the price theory, but there's no, there's no part of the conversation that that conveys that, well, I've got some now, but I've got some really, I mean, I just don't, I don't know what part of the conversation suggests that. He says, I'd like some drugs. And he says, okay, let's go over here and I'll get some. I mean, maybe he wanted to make sure he wasn't being followed, that there could be any number of explanation. And it is the standard. Wait, if he wasn't being followed, he then gets out of the car, looks around. Why does he go into White's house then? Maybe to give it some time to see if somebody is going to come following him, maybe to look through the window outside of a better vantage point to see it's a speculation, but what the bottom line is that it is also a speculation that he went inside to obtain drugs. And that, inference that he obtained drugs is relies too much on generalities. Do you think three times, if this same thing that happened three times, would that suffice? Well, that's the argument that the government make. It's a pattern. And I don't think three times in my opinion would not be sufficient, but it would definitely be three, four or five. It doesn't matter. It's still speculation. I think at some point, three times is different than two times. And if it happened in a closed session of each other on the same day, every time, let's say he orders drugs, he goes inside. Another person comes, order drugs, he goes inside. But so we can say three times and not only three times, but every time someone ordered drugs, he goes inside. So in that context, maybe three, and we know something more about the house that there is other suspicious activity about the house or this resident of this house, Mr. White has a criminal history or something. So in isolation, three times might or might not be, but here we don't have three times. We have two times and they happen in a span of 40 days. And also going back to your point, Judge Satter, when you said they didn't have eyes on him, when on a January transaction, when this other officer Liskey observed him, he observed Jared coming out, but he did not have eyes on him the whole time because he said, he observed Kanko traveling southbound in the direction of the affiant, in the direction. He does not say he observed him get in a car. He goes into quite details how he observed him get out of the car, travel, get out of car, go in, come back. So lots of details, but only says in the direction. So a fair inference is that there was a period of time when he didn't have eyes on him. So it is also entirely possible that Jared Kanko met someone else in that alley and obtained drugs. Let me ask, what is your best case that you can cite us that would be supportive of the district judge's decision that there was no probable cause? There is no case that it has exactly same facts and that's the problem here that it would push that line quite further. But I would say that there are two cases that government relied on, and I think they actually work in our favor. And these are Hauser and Allison. So in Hauser, the government make an argument that because defendant Hauser came out of his apartment, met with confidential informant and handed him cocaine and then returned in his house, that that is the same as here. And it is not the same because for several reasons. First, Hauser had a lot more information that is missing here. For instance, there was information from the confidential informant that Hauser has been buying drugs from the individual that's determined to be Hauser. So we have allegation of ongoing criminal activity by the defendant whose residence is searched. Hauser has lengthy criminal history that include drug trafficking, which again, we don't have here about Mr. White. Nothing is known about him. And then control by where Hauser exited his own residence, delivered drugs and returned into his own residence, which is markedly different than the situation that Jared Conkel simply went inside and outside after receiving order and before delivering drugs. Is that suspicious? That is suspicious. That raises a hunch, but is not sufficient concrete information that establishes this nexus, which has to be based on concrete facts, not vague facts. The other case is Allison. In Allison, we have a reliable confidential informant who observed two men known to him engage in drug transaction. And he observed one person exit the residence, meet another at a doorstep, deliver him a large amount of cocaine in plastic bags and return into the residence. So what is different in this case is the court in Allison emphasized that sequence of events that person came out of the house carrying these drugs and then returned back inside and several times emphasized that sequence. And that's not the sequence we have here. Sequence we have is that Jared Conkel went inside. We don't know what he did there. And he came out. And in Allison, he kind of happened at the doorstep of the residence while here it happened some distance away. And in fact, every case that the government cited for both probable cause and Leon Goodfait had a stronger facts than what we have here. For instance, for Leon Goodfait, they cited a carpenter. And that's the case where there was a helicopter flying over defendant's property, observed marijuana field, the house, and the road connecting the two. So in that, and the court found that there was no probable cause, but the Leon applied. But what we have there is ongoing criminal activity. I mean, someone had to plant these marijuana, tend to it, water it. And who is the likely person? Well, there is a house nearby and a road connecting the two. There is a concrete physical connection between the residence to be searched and ongoing criminal activity. But when we look at some other cases where Leon did not apply, we see that even these cases had more than what we have here. So for instance, in Christian, we have a situation where- Counsel, just one quick question, just maybe I wasn't listening carefully. In response to Judge Gilman's case, if we ruled against you, are there any out of circuit cases we would be contradicting? Out of circuit cases? Yes. That, I'm sorry, can you please- I'm just wondering, so I get your point. It's good for you for acknowledging these Fourth Amendment cases are often very fact specific. It's kind of hard to be entirely sure. But I'm just curious if you know of any out of circuit cases. In other words, not Sixth Circuit cases in which the court looked at a situation like this and agreed with Judge Yonker. I'm not aware of the case that had similar facts and Judge Yonker did not, in his opinion, cite any. The government cited Duke as out of court case, which I again think is different because in that case, there were three control buys within short succession. And also importantly, in that case, the confidential informant said that that person is known to have arranged drug deals. So that use of that word, arranged, shows that he is acting more as a middleman than what we have here. And I see that my time is almost up. So just want to conclude by saying that we ask the court to affirm the district court decision in this case. Unless the board has more questions. I don't think we do. All right, you have your rebuttal time, Ms. McManus. Thank you. I will just make three quick points. First, on the notion that speculation is required because no one observed what happened inside the Leahy residence. That is certainly the case. But as often the case, as it was in both Ellison and Hauser, where nobody actually saw what happened inside. But rather, it was a reasonable inference that the drugs that emerged with the from the residence were obtained therein. And in Ellison, the entirety of the probable cause information was that a confidential informant observed a person named Short exit a side door of the residence and meet with Red. While standing outside, Short did give Red a large quantity of cocaine in a plastic bag. After the deal was completed, Short went back inside the residence and Red left the property. That's it. One transaction. And while it's true that the person who sold the drugs went back inside, again, here the fact that the seller of the drugs had to stop at this location twice, equally or more supports the reasonable inference that the dealer was obtaining the drugs from inside the residence. On whether or not the second transaction was observed in its entirety, I will just again refer the court to paragraphs three and four of the affidavit, which we think established at least a very reasonable inference that Mr. Conkle was watched by law enforcement during the entirety of his path from the Leahy residence to Detective Schmidt where he delivered the drugs. And finally, on Carpenter, we do think that that was a good case. And so all that was required was that the affidavit establish a minimally sufficient nexus between the criminal drug activity and the place to be searched. But the court, of course, observed in that case that not only was there a road connecting the field to the house, but there were beaten paths and the defendant and his son were actually seen walking on those beaten paths in between the field and the house. Had that information been included in the affidavit, this court said that it would have established probable cause, a nexus under the higher probable cause standard. And we believe that we have here the equivalent of that because we do have law enforcement watching Mr. Conkle exit the Leahy residence and taking the drugs along a path, if you will, to Detective Schmidt where the sale is consummated on two occasions. For all of these reasons, we respectfully ask the court to reverse the decision of the district court. Thank you. We appreciate the argument both of you have given and will consider the matter carefully.